ORIGINAL

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

AUG 3 0 2005

Stephan Harris, Clerk
Cheyenne

Kathleen M. Karpan
Bagley, Karpan, Rose & White, LLC
1107 West 6th Avenue
Cheyenne, WY 82001
(307) 634-0446
Fax: (307) 637-7445

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

PROTECTION & ADVOCACY          )
SYSTEM, INC.                   )
                               )
            Plaintiff,         )
                               )
v.                             )          Civil Action No. 05CV014J
                               )
DAVID FREUDENTHAL, in his official )
capacity as Governor of the State of )
Wyoming; BRENT SHERARD, in his )
official capacity as Director of the )
Wyoming Department of Health; )
PABLO HERNANDEZ, in his official )
capacity as the Superintendent of the )
Wyoming State Hospital; and DIANE )
BAIRD-HUDSON, in her official )
capacity as Superintendent of the )
Wyoming  State Training School. )
                               )
            Defendants.        )

### FIRST AMENDED COMPLAINT

COMES NOW the Plaintiff, Protection & Advocacy System, Inc., by and through

counsel, and for its First Amended Complaint against the Defendants states and alleges as

follows:

NATURE OF ACTION

1.     On January 24, 2002, in the matter of *Chris S., et al., v. Jim Geringer, et al.*,
United States District Court, District of Wyoming, Case No. 94-CV-311-J (hereinafter "*Chris
S.* Action"), Protection & Advocacy System, Inc. (hereinafter "Plaintiff") entered into a
Stipulated Settlement Agreement (hereinafter "Settlement Agreement") with the State of
Wyoming through Governor Jim Geringer.   A true and correct copy of the Settlement
Agreement entered into in the *Chris S.* Action is attached hereto as Exhibit 1 and
incorporated herein by this reference.

2.     This is a civil action for injunctive and declaratory relief pursuant to 28 U.S.C.
§2201 for the breach of and to enforce the provision of the Settlement Agreement entered
into between the parties in prior litigation, prohibiting the State of Wyoming from retaliating
against Plaintiff; and for injunctive and declaratory relief under 42 U.S.C. §1983 to redress
ongoing deprivations of Plaintiff's federal rights and to prevent the Defendants from
restricting a full, complete, and meaningful access by Plaintiff to records of patients of the
Wyoming State Hospital and of the Wyoming State Training School, as mandated by the
Protection and Advocacy for Mentally Ill Individuals Act of 1986, 42 U.S.C. §§10801, *et seq.*
and its regulations, 42 C.F.R. Part 51, and the Developmental Disabilities Assistance and
Bill of Rights Act, 42 U.S.C. §§15001, *et seq.* and its regulations, 45 C.F.R. Part 1386.

3.     As precursor to the *Chris S.* Action, similar acts of denials of access by the
State of Wyoming against Plaintiff were alleged in the matter of *Protection & Advocacy*

2

*System, Inc. v. Leon Clyde Pruett, et al.*, United States District Court, District of Wyoming, Civil Action No. 95-CV-040, and subsequently settled by a Consent Decree and Order.

JURISDICTION AND PARTIES

4.     Subject matter jurisdiction is vested with the Court under 28 U.S.C. §1331, as this dispute arises under the laws of the United States including, but not limited to:  28 U.S.C. §2201; the Protection and Advocacy for Mentally Ill Individuals Act of 1986, 42 U.S.C. §§10801, *et seq.;* (hereinafter "PAIMI"); the Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. §§15001, *et seq.* (hereinafter "DD Act"); and other jurisdictional statutes referenced in the *Chris S.* Action. The Court has continuing subject matter jurisdiction for violations and to enforce the terms and provisions of the *Chris S.* Settlement Agreement pursuant to Section 1.03 thereof, which action was dismissed without prejudice.

5.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b).

6.     Plaintiff, Protection & Advocacy System, Inc., located at 320 West 25th Street, 2nd Floor, Cheyenne, Wyoming, is a private, nonprofit Wyoming corporation authorized by Congressional mandate to investigate incidents of abuse and neglect of persons with developmental disabilities and mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred. Congress has, pursuant to PAIMI and the DD Act, explicitly authorized protection and advocacy systems, such as Plaintiff, to pursue administrative, legal and other remedies to ensure the protection of

3

persons with developmental disabilities and mental illness.  Plaintiff is funded substantially by federal dollars. Plaintiff does not report to any state governmental entity regarding its work and no state governmental entity directs Plaintiff or participates in Plaintiff's decision-making process.

7.      David Freudenthal (hereinafter "Freudenthal") is being sued in his official capacity as Governor of the State of Wyoming.  Pursuant to W.S. §9-1-201, as Governor, Freudenthal is the chief executive officer and his responsibilities include, but are not limited to, formulating and administering the policies of the State of Wyoming and is responsible for the general supervision, direction and control over the executive branch of the State of Wyoming, including the Department of Health.

8.      Brent Sherard (hereinafter "Sherard") is being sued in his official capacity as Director of the Wyoming Department of Health.  Pursuant to W.S. §§9-2-101, *et seq.*, as Director of the Department of Health, Sherard is the chief administrative officer and immediate supervisor of all administrators and heads of agencies and institutions that are assigned to the Department of Health, including the Wyoming State Hospital (hereinafter "WSH") and Wyoming State Training School (hereinafter "WSTS").   Sherard's responsibilities include, but are not limited to, administering state programs for mental health and developmental disabilities services, coordinating a network of programs and facilities for those services, establishing standards, policies, procedures, rules and

4

regulations for the delivery of those services, and disbursing and administering state and federal funds or other monies allotted to the Department of Health.

9.      Pablo Hernandez (hereinafter "Hernandez") is being sued in his official capacity as Superintendent of the WSH. As Superintendent, or agency head, of the WSH, Hernandez' responsibilities include, but are not limited to, administering state programs for mental health and developmental disabilities services at the WSH, coordinating a network of programs and facilities for those services, establishing and ensuring compliance with standards, policies, procedures, rules and regulations for the delivery of those services, disbursing and administering state and federal funds or other monies allotted to the WSH, operating the WSH, and protecting, caring for, and treating patients at that facility.

10.     Diane Baird-Hudson (hereinafter "Baird-Hudson") is being sued in her official capacity as Superintendent of the WSTS. As Superintendent, or agency head, of the WSTS, Baird-Hudson's responsibilities include, but are not limited to, administering state programs for developmental disabilities services at the WSTS, coordinating a network of programs and facilities for those services, establishing and ensuring compliance with standards, policies, procedures, rules and regulations for the delivery of those services, disbursing and administering state and federal funds or other monies allotted to the WSTS, operating the WSTS, and protecting, caring for, and treating patients at that facility.

11.     Under Section 2.01 of the Settlement Agreement, the State of Wyoming was defined to mean the defendants in the *Chris S.* Action and their successors in office.

5

Defendants Freudenthal, Sherard, and Hernandez, are the same defendants or successors in office to the defendants named in the *Chris S.* Action and are responsible for implementation and assuring compliance with the terms and conditions of the Settlement Agreement.

12.    Defendants Freudenthal, Sherard, Hernandez, and Baird-Hudson, represent the State of Wyoming and are responsible for actions taken under color of state law that deny and restrict full, complete and meaningful access by Plaintiff to records of patients of the WSH and WSTS as required by Federal law.

FACTS APPLICABLE TO ALL CLAIMS

13.    Section 2.02 of the Settlement Agreement requires that the State of Wyoming not engage in any retaliatory action against Plaintiff.

14.    Since entering into the Settlement Agreement, the State of Wyoming, by and through the Defendants herein, have retaliated against Plaintiff by denying, delaying and/or restricting Plaintiff's right of access, as provided by PAIMI and the DD Act, to patient records and other relevant information and documents in Defendants' custody and control.

15.    Paragraphs 16 through 43 hereof set forth details of the history, pattern, and specifics of retaliation and restriction of access by Defendants Freudenthal, Sherard, and Hernandez against Plaintiff as generally relates to WSH and PAIMI.

16.    For years preceding the *Chris S.* Action and following entry into the Settlement Agreement, the State of Wyoming and WSH generally complied with records

6

requests by Plaintiff, including providing Plaintiff with unredacted incident reports created by WSH staff.

17.     In February of 2003, a WSH patient, G.S., was found hanging from a door closer fixture in the hallway of the forensic unit of WSH.  G.S. was discovered by another WSH patient, G.G., and survived the suicide attempt.  As is the standard practice, Plaintiff initiated an investigation into the near suicide.  Plaintiff was given access to requested information without objection.

18.     As a result of information obtained in the investigation, including the fact that G.G. had not been informed that the patient he helped had survived, that G.G. had himself expressed and exhibited suicidal ideations and gestures after G.S.'s attempted suicide, and that G.G. apparently had been given no or inadequate counseling or therapy regarding the incident, Plaintiff began questioning the adequacy of overall WSH staffing, treatment, and other elements necessary to provide proper health, safety and welfare of WSH patients.  Defendant Hernandez steadfastly denied that any problems or issues existed at WSH.

19.     Faced with Defendant Hernandez' persistent denials of any problems at WSH, Plaintiff retained outside counsel and started meetings with the Wyoming Attorney General's office (hereinafter "AG"), to address those issues and concerns in a March of 2003 meeting.  Like Defendant Hernandez, the AG generally denied any lack of staff or proper care and treatment at WSH.

7

20.    On or about April 8, 2003, WSH patient T.B. died after jumping from a WSH van while it sped down the interstate highway. Plaintiff investigated this incident and was given access to requested information without objection.

21.    As a result of Plaintiff's investigation of this fatal event, Plaintiff's concerns over an evident lack of WSH staffing and proper care and treatment of patients further escalated. Defendant Hernandez continued to strenuously and repeatedly deny that any staffing or treatment concerns or issues existed at WSH.

22.    On or about April 21, 2003, Plaintiff met again with the AG to discuss Plaintiff's rising concerns about staffing and conditions at WSH, without any resolution.

23.    Beginning May 1, 2003, WSH administration began denying Plaintiff access to WSH incident reports.

24.    Based upon an immediate and serious need to assess and determine the scope and extent of what appeared to be a growing systemic patient-safety problem, in early June of 2003 Plaintiff formally and in writing requested copies of all WSH incident reports on grounds that Plaintiff had probable cause to believe the health and safety of all WSH patients were at risk.  Defendants refused or failed to comply with Plaintiff's request for incident reports.

25.    In August of 2003, WSH patient E.F., an arsonist, set fire to his cell in cellblock "A" of the forensic unit of WSH after accumulating in his room substantial combustible materials and a means of starting a fire.  Plaintiff invoked probable cause to

8

investigate. Although access to documents was generally permitted, Plaintiff received nonresponsive, evasive, misleading and contradictory responses from WSH administration regarding the arson and WSH policies and procedures.

26.    With ongoing concerns over apparent continuing problems at the WSH, in late 2003, Plaintiff renewed discussions with the AG regarding WSH's provision of incident reports to Plaintiff. During one particular meeting on November 10, 2003, the AG stated that as a result of friction, Plaintiff's access was not as good as it was in the past. An attorney with the AG, serving on the Health Insurance Portability and Accountability Act (HIPAA) committee, stated that HIPAA and its promulgated privacy rules that had become effective April 14, 2003, did not apply to Plaintiff.

27.    On February 9, 2004, the AG and Plaintiff met to again discuss production of incident reports that had been requested since the previous June. At that time, the AG asserted that HIPAA did restrict Plaintiff's access rights.

28.    In the February 9, 2004 meeting, the AG stated that while WSH could provide Plaintiff with incident reports even under HIPAA, the HIPAA reporting requirements could possibly be unduly onerous and consume too much staff time. Nonetheless, it was agreed that WSH would provide future incident reports on a weekly basis, with patient names redacted. Approximately one-half of the incident reports from 2003 were provided to Plaintiff at that meeting and WSH promised to provide the remaining incident reports very soon.

9

29.     By letter dated February 10, 2004, the AG sent a letter to memorialize some

of the terms agreed to in the February 9, 2004 meeting, stating that WSH was providing

incident reports voluntarily because Plaintiff had no legal authority to access those reports,

but, because of provisions of HIPAA, patient names would be redacted.  However, WSH

agreed that it would provide that information if Plaintiff requested it.  The AG further

asserted Plaintiff was a "health oversight agency" under HIPAA and, as such, was entitled

to only the minimum necessary information to accomplish the intended purpose for the

disclosure.

30.     On or about February 12, 2004, Plaintiff responded by letter stating that

Plaintiff was expecting to receive the remaining one-half of the 2003 incident reports

without delay, accepting that patient names would be redacted but made promptly

available upon Plaintiff's request, and noting that Plaintiff's request for the incident reports

was founded upon facts creating a hospital-wide probable cause under PAIMI for concern

of WSH patient safety.  Plaintiff disagreed that the provision of incident reports was

voluntary. Plaintiff proposed that it would physically pick up the incident reports on a daily

basis, rather than telefaxing as offered, because of the poor quality of the telefaxed

documents.  WSH did not respond to that letter.

31.     When one of Plaintiff's advocates went to WSH to make arrangements for

obtaining the promised incident reports, she was advised that reports would not be

provided on a daily basis, that in addition to patient's identifying information, all staff-

10

identifying information would be redacted, and that there would be a $ .50 per page copy fee assessed.  Plaintiff sent a letter of objection to the changes imposed by the WSH.

32.    In response, the AG wrote and denied that any sort of agreement had been reached at the February 9, 2004, meeting but agreed that WSH would redact only patient names from incident reports and that WSH had only agreed to make the reports available in a prompt fashion. In addition, although WSH had historically provided copies with no charge and had offered at the November meeting to telefax incident reports with no mention of a  fee, it stated that there would indeed be a copying charge of $.50 per hard copy page because of "the increase in volume of document requests."

33.    Plaintiff objected to the proposed copying charge and stated that in such event it preferred to receive the incident reports by telefax as had been offered. WSH refused to telefax the reports and Plaintiff has been obtaining copies of redacted incident reports approximately weekly by hand pick-up.

34.    In March of 2004, Plaintiff began noticing that the consecutively numbered WSH incident reports it was receiving failed to include approximately 25% - 35% of the reports.  Plaintiff requested that WSH provide the missing incident reports and, after receiving no response, submitted a second request two weeks later. The omitted incident reports have never been provided.

35.    In March of 2004, WSH reported that V.D. had committed suicide by hanging herself in her room at WSH.  Plaintiff initiated a death investigation, including conducting

11

interviews of direct care providers and WSH patients. Plaintiff was generally given access to records, staff and facilities necessary to investigate this incident without significant objection or delay.

36.     Plaintiff's investigation revealed conduct by WSH that appeared to be attempts to mislead and misdirect Plaintiff's investigation.

37.     A patient witness stated to Plaintiff's investigator that she observed V.D. request to speak with Dr. Crowe just prior to her initial suicide attempt by ingestion of pills. The records provided to Plaintiff's investigator give no indication of V.D. making the request or whether Dr. Crowe ever complied.

38.     A patient witness stated to Plaintiff's investigator that she observed V.D. skip attendance of her group counseling session just prior to her attempted suicide by pills, going instead to a friend's vehicle in the parking lot during the group session. WSH documents provided to Plaintiff incorrectly indicate that V.D. was attending her group session.

39.     Some WSH staff reported that they had been subjected to intimidation or coercion from WSH administration aimed at getting them not to speak to Plaintiff's investigators or preventing them from speaking out about problems at WSH. WSH staff asserted that documents in some patient records had been removed, altered, or falsified.

40.     WSH staff reported that after V.D.'s suicide by hanging, WSH administration had ordered immediate modifications, in the middle of the night, to patient rooms, including

V.D.'s, to remove some design features. WSH administrators denied to Plaintiff that these alterations had occurred at the time indicated.

41.     Alteration and falsification of records, intimidation and threats against potential witnesses, and attempts to conceal or destroy relevant evidence by WSH are improper and such conduct severely inhibits Plaintiff's ability to conduct a proper investigation into possible patient neglect.

42.     As a result of the investigation into V.D.'s death, Plaintiff again expressed an increasing concern that understaffing and lack of administrative oversight may have created dangerous conditions at WSH and contributed to V.D.'s suicide.

43.     After V.D.'s suicide, Plaintiff continued to object to the denials, delays and restrictions being placed by WSH and AG upon Plaintiff's access rights, stating that the access rights were necessary in order to properly investigate incidents and conditions at the WSH. Plaintiff's access requests were frequently met with delays and objections, on various and irregular grounds. Defendant Hernandez continued to strenuously deny there were any problems at the WSH.

44.     On or about October 8, 2004, another WSH patient, R.M., very nearly completed suicide by hanging. As a result of his attempt, R.M. incurred a significant brain injury. Plaintiff invoked probable cause and commenced an investigation, finding that several of the factors Plaintiff believed to have contributed to V.D.'s suicide were contributing factors in R.M.'s attempted suicide.

13

45.     As a direct result of Plaintiff's concerns and Defendant Hernandez' continuing

denials that there were any problems at WSH, Plaintiff determined that litigation would

probably be necessary to protect the health, safety, and welfare of citizens with disabilities

at the WSH.

46.     On October 13, 2004, several regional newspapers reported that Plaintiff

announced it was poised to file a lawsuit against the State of Wyoming over on-going

conditions at WSH that posed risks to the health and safety of all WSH patients.  A copy of

one such article is attached hereto as Exhibit 2.

47.     Paragraphs 48 through 56 hereof set forth details of the history, pattern, and

specifics of further retaliation and restriction of access by Defendants Freudenthal,

Sherard, and Hernandez after October 13, 2004, as relates to "not guilty by reason of

mental illness" ("NGMI") patients at the Wyoming State Hospital and access rights of

Plaintiff under PAIMI.

48.     On or about January 31, 2005, based upon a newspaper report of a WSH

patient ordered to WSH on grounds he was NGMI (of stealing a car) and who had been

confined to WSH for six years without receiving a court hearing to review his commitment

order, Plaintiff delivered a letter invoking probable cause to review the files of all current

NGMI patients, whether inpatient or outpatient, admitted to WSH under NGMI orders on or

before August 1, 2004.

14

49.     Plaintiff's letter requested records identifying those NGMI individuals; admission records, including but not limited to, evaluations and assessments; psychiatric and mental health records related to any treatments provided; correspondence regarding the individuals between WSH or the individuals and any court of legal authority; and copies of any WSH policies regarding the evaluation, treatment, and discharge of such individuals.

50.     On or about February 2, 2005, the AG sent Plaintiff a letter stating that the requested records would take some time to gather and copy due to the volume of documents involved and that WSH would not be able to produce the documents within the 72 hours requested by Plaintiff.

51.     On or about February 14, 2005, WSH delivered approximately two-thirds of a banker's box of records concerning 14 NGMI patients. The documents provided had been Bates stamped and were minimal and incomplete. For example, the total records provided for F.R. committed to WSH since November of 2001, consisted of 65 pages of WSH records and 12 pages of court documents. Most of the WSH records documented regular physical examinations and assessments.  Notably absent were F.R.'s psychiatric treatment plans.  F.R.'s mother and guardian later provided Plaintiff with several pages of WSH treatment plan records for F.R. that had not been provided by WSH.

52.     Records of another patient, E.F., committed to WSH in June of 2001, consisted of 71 pages of WSH records and 21 pages of court records. Like F.R., no treatment plan records were provided regarding E.F.  In contrast, the records of C.P., much

more recently admitted in August of 2004 consisted of 61 pages of WSH records and 10 court documents, only slightly fewer than were provided for F.R., a WSH patient of more than 3 years.

53.    E.O. was committed to WSH in March of 2004.  His submitted file consisted of 74 pages of WSH records, 23 pages of court records.  Notably, the WSH records indicated that no therapy or medication was being provided to E.O. because none was deemed necessary by WSH psychiatrists.

54.    G.A. was committed to WSH in October of 2003. His submitted file consisted of 27 pages of WSH records, mostly physical examinations, and 26 pages of court records. There were no records of therapies or treatments and no indication medications were being monitored or regulated.

55.    J.S. was committed to WSH in March of 1990.  His submitted file consisted of 92 pages of WSH records and for some years only 2 to 4 pages of WSH records were provided.

56.    The records regarding NGMI patients provided by WSH in response to Plaintiff's request for information based upon its invocation of probable cause were incomplete, unreliable and did not fairly represent the true scope and nature of mental health treatments and competency evaluations provided to those patients.

57.    Paragraphs 58 through 67 hereof set forth details of the history, pattern, and specifics of further retaliation and restriction of access by Defendants Freudenthal,

16

Sherard, and Hernandez after October 13, 2004, as relates to access by Plaintiff at WSH and the Patient Bill of Rights under PAIMI.

58.     On or about February 14, 2005, Plaintiff received a redacted copy of WSH incident report number 6,427, dated January 29, 2005. This report suggested that WSH improperly denied an unnamed patient the right to have visitors, in violation of the PAIMI Bill of Rights. Consistent with then-existing practice, on February 14, 2005, Plaintiff's advocate mailed to WSH Executive Secretary a written request for the name of the patient or of the guardian.

59.     The WSH Executive Secretary acknowledged receipt of Plaintiff's February 14, 2005, letter on February 16, 2005, by a letter dated March 22, 2005. WSH refused to provide the requested information without a release signed by the patient, citing HIPAA regulations.

60.     Plaintiff was unable to obtain a release from the patient or the patient's guardian, if applicable, because the patient's identity was not known or provided. Plaintiff has still not been provided with this information.

61.     For several months Plaintiff noted incident reports in which WSH patients were complaining to WSH staff that their personal property could not be found when they requested it or that the personal property had been stolen.

17

62.     In April and May of 2005, WSH patient R.B. repeatedly expressed concerns to Plaintiff that WSH was not properly safeguarding R.B.'s personal property, in violation of the PAIMI Bill of Rights.

63.     Based on R.B.'s complaints, Plaintiff asked WSH for information regarding R.B.'s personal property, but were refused any information.

64.     In order to obtain the needed information, Plaintiff invoked probable cause with respect to R.B. by a letter delivered to WSH at approximately 2:40 p.m. on June 2, 2005. Plaintiff's letter was captioned "invocation of probable cause with respect to [R.B.]" and stated in the opening sentence that Plaintiff "hereby invokes its federal legal authority to investigate incidents of abuse and neglect of the above-referenced individual with mental illness" under PAIMI.  Specifically, Plaintiff sought access to WSH records and related materials and access to portions of the WSH facilities as to which R.B.'s personal release alone could not be effective.  Access by Plaintiff to WSH facilities was eventually granted.

65.     By letter dated June 2, 2005, the AG faxed a letter to Plaintiff's advocates in Evanston, refusing to provide access without authorization from R.B., and requiring that R.B. sign a HIPAA compliant authorization form.

66.     WSH was aware that R.B. had one or more guardians and could not provide legally effective authorization for any release.

18

67.     At no time on or after the invocation of probable cause on June 2, 2005, has WSH or AG provided Plaintiff with the name and contact information for any guardian of R.B., as necessary to obtain the consent requested by WSH.

68.     Paragraphs 69 through 81 hereof set forth details of the history, pattern, and specifics of further retaliation and restriction of access by Defendants Freudenthal, Sherard, and Hernandez after October 13, 2004, as relates to a WSH patient suicide investigation by Plaintiff under PAIMI.

69.     On or about May 23, 2005, J.M. was released by WSH for a home visit.  In the pre-dawn hours of May 25, 2005, J.M. took a gun and shot herself to death. WSH reported J.M.'s suicide to Plaintiff on May 25, 2005.  Plaintiff invoked its right to access records to investigate J.M.'s death.

70.     On May 27, 2005, WSH notified Plaintiff in writing that serious problems had developed with its electronic data system (AVATAR) on or about May 26, 2005, and WSH was unable to access and print the electronic records. Plaintiff requested access to any hard copy records concerning J.M.

71.     On May 31, 2005, although WSH had accumulated a stack of available records, WSH refused to release the available records to Plaintiff because the AG wanted to Bates stamp the documents and wished to place some of the unavailable AVATAR documents inside the available records, allegedly to keep them chronological.

72.     Plaintiff objected to the delay in producing the available records. Later that day, WSH stated that the AG had authorized the release of the hard records if the AVATAR records were not available by the following morning.

73.     On June 1, 2005, the AVATAR records were still not available and WSH provided Plaintiff with copies of the available records concerning J.M. The AVATAR records were produced when the system was repaired.

74.     In the course of investigating J.M.'s suicide, Plaintiff became aware that another WSH patient, C.C., had been placed on red-card (high restriction) status by WSH administrative personnel, allegedly because of involvement C.C. had in J.M.'s suicide.

75.     Plaintiff's investigators attempted to interview WSH administrative personnel Craig Kirkland and David Grether to determine what information they had regarding C.C.'s alleged involvement in J.M.'s suicide

76.     David Grether refused to answer any questions about the incident and referred the investigators to Defendant Hernandez. Craig Kirkland refused to answer questions stating that he would need permission from the AG before cooperating with Plaintiff's investigation.

77.     WSH staff reported to Plaintiff's investigators that they had been instructed by David Grether not to talk to Plaintiff's investigators about the J.M. incident.

20

78.     WSH administration was aware of C.C.'s alleged sexual assault of J.M. on or before May 31, 2005, when Craig Kirkland conducted interviews of witnesses and reported the incident to the Evanston Police Department.

79.     On June 2, 2005, Plaintiff's investigators interviewed Defendant Hernandez who stated he did not know of any linkage between J.M.'s suicide and the restrictions placed on C.C., but that C.C. was being investigated for being rude and bullying other patients.

80.     Plaintiff's investigation, however, determined that reports had been made to WSH by witnesses, and orally by J.M. herself, that C.C. had sexually assaulted J.M. (a prior rape victim) just prior to her release on home visit and that the incident left J.M. "very shaken up," "visibly upset," and "still being very upset about it" immediately before her home visit.

81.     There do not appear to be any WSH incident reports relating to the alleged sexual assault, although this is the type of event that in the past has generated such reports. Patient witnesses have informed Plaintiff that they filed patient input forms relating to the alleged sexual assault.  WSH has refused to provide Plaintiff with access to any WSH patient input forms related to C.C.'s alleged sexual assault upon J.M.

82.     Paragraphs 83 through 86 set forth details of the history, pattern, and specifics of further retaliation and restriction of access by Defendants Freudenthal,

21

Sherard, and Hernandez after October 13, 2004, as relates to the investigation by Plaintiff under PAIMI of a liberty restriction at WSH.

83.     On or about June 2, 2005, Plaintiff determined that the personal liberty restrictions placed upon C.C. by WSH administration following J.M.'s suicide were not based upon therapeutic recommendations, but were intended to be punitive, retaliatory, and constituted possible abuse/neglect of C.C.

84.     C.C. became a client of Plaintiff by his guardian's signature on a release authorization and Plaintiff sought, in writing, access to WSH records pertaining to the restraint, restriction, and treatment of C.C. at WSH.

85.     Although Plaintiff's letter expressly stated probable cause was being invoked and that C.C. was a client of Plaintiff, the AG refused to provide the requested access "without authorization from your client," demanding that the client "sign a HIPAA compliant authorization form," and because Plaintiff "failed to properly invoke probable cause."

86.     The reasons given for refusing Plaintiff access to records necessary to conduct a proper and timely investigation were improper, not founded on reasonable grounds, and dilatory in nature.

87.     Following the *Chris S.* Action involving WSH and the *Weston* lawsuit involving WSTS and throughout the period of time during which WSH was delaying and denying Plaintiff access to records on a variety of grounds and reasons, the State of Wyoming and WSTS generally complied with records and information requests by Plaintiff, including

providing Plaintiff with unlimited access to unredacted incident reports created by WSTS staff.

88. After the October 13, 2004, news report of Plaintiff's impending lawsuit against the State of Wyoming and WSH, Defendants Freudenthal, Sherard, and Baird-Hudson retaliated against Plaintiff and further restricted Plaintiff's right of access.

89. Paragraphs 90 through 104 set forth details of the history, pattern, and specifics of retaliation and restrict of access by Defendants Freudenthal, Sherard, and Baird-Hudson after October 13, 2004, as relates to a death investigation by Plaintiff at WSTS under the DD Act.

90. On or about November 1, 2004, WSTS notified Plaintiff that a resident of WSTS, D.M., had died on October 30, 2004. Pursuant to regular procedures, Plaintiff opened a death investigation file regarding D.M.'s death at WSTS.

91. On November 3, 2004, and pursuant to prior historical practice, Plaintiff's advocate made an oral request to review WSTS's internal report on D.M.'s death. Plaintiff's request was orally acknowledged by WSTS administration and a copy of the internal report was provided on November 12, 2004.

92. On November 15, 2004, after reviewing the internal report, Plaintiff requested, again orally and consistent with prior historical practice, access to and/or production of D.M.'s records, which oral request was acknowledged by WSTS with a time to review the records scheduled for November 18, 2004, at or around 10:00 a.m.

23

93.     The review of records did not take place as scheduled because WSTS administration subsequently stated, orally, that it would now require a written request for access to D.M.'s records.

94.     On November 22, 2004, Plaintiff submitted a written request for access to a specific list of records. WSTS administrators had actual knowledge at the time that the individual signing the request had been dealing with WSTS on Plaintiff's investigation of D.M.'s death as Plaintiff's advocate employee in Plaintiff's Lander, Wyoming office.

95.     On November 23, 2004, WSTS printed at least 18 pages of patient records regarding D.M., but then orally refused to produce those records for Plaintiff on grounds there was no signed release from D.M.'s former guardian.

96.     Although Plaintiff believed there were no legal grounds or authority for a former guardian of a deceased individual to authorize a release of the deceased individual's information and, although the DD Act permitted Plaintiff to investigate D.M.'s death without the consent of another party, on or about November 29, 2003, Plaintiff provided the newly-requested written release.

97.     WSTS then refused to accept the guardian's release authorization as sufficient to allow Plaintiff the access requested and the records were again not disclosed.

98.     On December 6, 2004, at or around 11:55 a.m., Plaintiff hand-delivered a second written request for access to D.M.'s records, signed by the same advocate trying to

24

conduct the investigation from the beginning, and expressly based upon the fact "[a] death occurred," as is provided in the DD Act.

99.    On December 7, 2004, WSTS apparently placed the available records in the U.S. Mail addressed to Plaintiff's Lander office despite the fact said office is located on the grounds of WSTS.  The records were received by Plaintiff on December 8, 2004, at approximately 3:40 p.m.

100.    As a result of Defendants' actions, Plaintiff received D.M.'s requested records several weeks after first requesting them in accordance with historical practice, 16 days after making the request in writing, and more than 48 hours after making a second written request expressly citing the fact Plaintiff was making the request based upon the WSTS resident's death and citing the relevant statutory authority.

101.    By letter dated December 29, 2004, to Plaintiff's advocate involved in the investigation of D.M.'s death, Defendants gave written notice to Plaintiff that thereafter, any access to the records of Department of Health clients receiving Medicaid benefits would require prior submission of a specific form F-11; Use and Disclosure Authorization. Defendants' letter cited State Medicaid Rules, Chapter 38, Section 6(e), which expressly provides that client information shall not be released without such a release, unless pursuant to applicable Federal or State laws.  This new requirement had not previously been asserted as grounds for restricting Plaintiff's access to records and documents.

102.    By letter dated March 25, 2005, attorneys for WSTS provided additional excuses for not complying with Plaintiff's access requests regarding D.M.'s death investigation, but as to which Plaintiff never received written notice at the time. That letter claimed that: (i) D.M.'s guardian's release was not valid because such guardian was only acting in that role to wrap-up his affairs and was not a guardian appointed after [D.M.'s] death, (ii) Plaintiff's initial written request failed to make a probable cause statement, and (iii) the letter was "not even on P&A letterhead."

103.    The DD Act states that in the event of the death of an individual with developmental disabilities, a protection and advocacy system shall have immediate access not later than 24 hours, without the consent of another party, to the records of the individual. Plaintiff is not required to make a declaration of probable cause or obtain the consent of any party to investigate the death of an individual with developmental disabilities.

104.    None of the excuses asserted by Defendants for failing to provide access to D.M.'s records are valid or reasonable.

105.    Paragraphs 106 through 113 set forth details of the history, pattern, and specifics of further retaliation and restriction of access by Defendants Freudenthal, Sherard, and Baird-Hudson after October 13, 2004, as relates to any injury investigation by Plaintiff at WSTS under the DD Act.

106.   On or about 3:30 p.m., March 14, 2005, the AG contacted Plaintiff's Lander office and reported that an unnamed resident of WSTS had gone AWOL while on an outing on May 12, 2005, and may have been injured.

107.   At approximately 3:55 p.m. the same day, Plaintiff provided WSTS with a letter requesting contact information for the guardian of the individual, later identified as R.J., if any, in accordance with the historical practice previously established and being followed by WSTS.

108.   On the morning of March 15, 2005, Plaintiff's advocate contacted WSTS regarding R.J.'s guardian-contact information. The WSTS administrator was not available so a message was left. Approximately one hour later the AG called and advised Plaintiff that the requested contact information would not be released and that they were not required to provide that information for 3 days.

109.   The AG stated that a WSTS administrator would be talking to R.J.'s mother and guardian that evening at R.J.'s hospital, would tell the mother of Plaintiff's services, and inquire as to whether she wanted to authorize Plaintiff to act on R.J.'s behalf. Plaintiff's advocate stated he would rather speak to the guardian directly, but the contact information was not provided.

110.   Plaintiff's counsel then contacted the AG to discuss the refusal and delay in providing the requested information.  The AG disputed the need to release the requested information, contested Plaintiff's authority to invoke probable cause to investigate the

27

incident, and then stated that information would be provided if a probable cause letter was provided.

111.    On March 15, 2005, the requested probable cause letter was faxed to the AG.   At or around 4:45 p.m., on March 15, 2005, WSTS notified Plaintiff that the information would be made available to Plaintiff.

112.    When Plaintiff was told on March 14, 2005, that a WSTS resident had gone AWOL and may have been injured on March 12, 2005, WSTS was aware that R.J.'s one-on-one aide had lost R.J., that R.J. had been on his own for approximately six hours, that R.J. had walked for several miles across the deserted plains, and that he had fallen down a precipitous rock face causing him to suffer broken ribs, a broken ankle, possibly a broken pelvic bone, and a lung collapsed.

113.    The information initially provided to Plaintiff by Defendants concerning the scope and nature of the incident involving R.J. was materially misleading. Further, Defendants unreasonably denied and delayed the provision of basic information necessary for Plaintiff to conduct a timely and proper investigation.

114.    Paragraphs 115 through 120 set forth details of history, pattern, and specifics of further retaliation and restriction of access by Defendants Freudenthal and Sherard after October 13, 2004, as relates to the death investigation by Plaintiff of M.S. under the DD Act.

28

115.   On or about April 5, 2005, as the result of the death of M.S., an individual with developmental disabilities receiving services from the Wyoming Department of Health, Plaintiff delivered a letter to the Developmental Disabilities Division of the Wyoming Department of Health.  This letter invoked a probable cause determination pursuant to 42 U.S.C. §15043(a)(2)(J)(ii)(II) for purposes of investigating the circumstances of M.S.'s death.   A similar access request letter was sent to the community services provider, Fremont County Coroner, and Fremont County Attorney.

116.   Except for the Developmental Disabilities Division, all of the entities contacted either promptly provided records or stated they had no such records.

117.   On April 12, 2005, a Department of Health representative notified Plaintiff by telephone that the requested information concerning M.S. was being mailed by certified mail.

118.   On April 13, 2005, a different Department of Health representative notified Plaintiff by telephone that the Department of Health had been advised by the AG not to send the information on M.S. until the AG representing the Department of Health had reviewed Plaintiff's probable cause letter.  However, that AG attorney was on vacation and would not be available for several days.

119.   The noted oral statement was followed by a letter on April 18, 2005, stating the records would not be made available.  However, there was no mention of an objection to production of the documents based upon HIPAA, an absence of a release from the

deceased individual's guardian, or any other reason given for failure to provide Plaintiff access to the requested records.

120.   Plaintiff received the documents requested from the Department of Health on April 22, 2005, at 1:30 p.m., some 17 days after making the request pursuant to the specific provision of the DD Act calling for access to be provided to Plaintiff within 24 hours, without the consent of another party.

121.   Paragraphs 122 through 134 set forth details of the history, pattern, and specifics of further retaliation and restriction of access by Defendants Freudenthal, Sherard, and Baird-Hudson after October 13, 2004, as relates to an investigation by Plaintiff of cottage resident consolidation at WSTS under the DD Act.

122.   On or around April 21, 2005, Plaintiff's advocates were informed that WSTS was in the process of closing two cottages and doubling up the nine residents therein into existing housing.  Plaintiff's advocates heard that reasons for the consolidations were financial, because of staffing shortages, and necessity to make room for use of the WSTS grounds by other entities. Plaintiff's advocates were made aware of concerns that some of the residents being moved had significant behavioral issues; that some residents in the existing cottages also have behavioral issues that might escalate because of the move; that some residents would be forced to share a room; and that community space in the cottages being moved into may have to be used as bedroom space to accommodate the additional residents.  It was reported that the consolidation was to happen by May 1, 2005.

123. Based upon reported concerns by WSTS staff, pursuant to the DD Act, on the morning of April 27, 2005, Plaintiff sought to obtain access to records, files, and other documents concerning the consolidation of housing by hand-delivery of a letter stating Plaintiff had determined there was probable cause to believe the health or safety of the individuals was in serious and immediate jeopardy and requesting access to records.

124. The DD Act requires that Plaintiff shall have immediate access, not later than 24 hours after it makes a request, without consent from another party, where Plaintiff determines there is probable cause to believe the health or safety of the individuals was in serious and immediate jeopardy.

125. The AG had advised WSTS to submit all requests for information from Plaintiff to go through the AG.

126. On April 28, 2005, at or around 9:00 a.m., WSTS informed Plaintiff's advocate that portions of three of the nine files were available. However, WSTS further advised Plaintiff's advocate that no access to other records would be granted without first obtaining the guardians' permission.

127. On Friday, April 29, 2005, at 5:06 p.m., after Plaintiff's office had closed, a letter faxed by the AG was received in Plaintiff's Cheyenne office, informing Plaintiff that because WSTS had spoken to Plaintiff's advocate on April 28, 2005, about the situation, WSTS "has concerns that the probable cause determination was reconsidered by P&A, although the WSTS was told by [Plaintiff's advocate] that these requests for access can

31

not [sic] be revoked or revised once they are put into motion." The letter asked if Plaintiff still maintained its probable cause determination, and if so, access would be provided, but only to the three client files WSTS previously tendered.

128.   On Monday, May 2, 2005, at approximately 9:20 a.m., Plaintiff responded to the April 29th letter, again pointed out that access requirements under the DD Act gave Plaintiff the right of immediate access, within 24 hours, without consent from another party and re-asserted its access right to all records contained in all nine files.

129.   Later the same day, May 2, 2005, at approximately 3:15 p.m., the AG responded by facsimile, stating that because Plaintiff had re-iterated its determination of probable cause, access to the requested records would be granted on May 3, 2005, by 9:18 a.m.

130.   On May 3, 2005, at approximately 8:30 p.m., more than 140 hours after making its probable cause request for access, WSTS granted Plaintiff's advocates access to the requested records.

131.   When Plaintiff's advocates entered the room to review the records as had been agreed, they were surprised by the presence of more than two dozen WSTS employees. The presence of WSTS employees was not requested by Plaintiff and not required under the DD Act. The ministerial act of producing records for inspection did not require the presence of any employees.   Plaintiff's advocates suggested that the employees return to their regular duties.

32

132.   On May 13, 2005, Plaintiff asked for copies of certain documents that had been reviewed by Plaintiff's advocates on May 3, 2005.  On May 18, 2005, WSTS provided copies of some, but not all requested documents.  Although Plaintiff had been given access to and did read the omitted documents on May 3, 2005, WSTS has refused to provide copies of some requested documents on the asserted basis of attorney-client privilege and WSTS' interpretation of what documents previously reviewed by Plaintiff were considered "records" under the DD Act.

133.   On May 20, 2005, Plaintiff again requested copies of the omitted documents citing continued delays. On May 26, 2005, the AG again refused the request. The WSTS attorney now stated that Plaintiff had failed to cite legal authority which WSTS was required to abide by when producing copies and there was no reference to "copies" within the text of the DD Act.  The AG stated that "[w]ithout such a law, the Training School had no time frame as to when it must produce copies, where it must produce copies, or if it had to produce copies at all."

134.   Defendants' excuses, delays, and restrictions are contrived, intermittently asserted, and selectively imposed to unreasonably hinder and delay Plaintiff in complying with its federally mandated duties.

135.   On March 8, 2005, Plaintiff contacted a Department of Health representative in the Developmental Disabilities Division and asked whether a specific individual was certified to provide services to persons with developmental disabilities.  Although Plaintiff

33

referenced a client, the information Plaintiff sought was a matter of public record and did

not seek any personally identifying, health, or other confidential information of the client.

However, the Department of Health representative refused to provide Plaintiff with this

general information without presentation of a signed release from Plaintiff's client.

136.    The foregoing access violations under PAIMI and PADD are not exclusive or

exhaustive and constitute a part of a continuing pattern of violations of applicable federal

law.  Plaintiff expressly reserves the right to allege additional violations related to such

pattern of violations as such occur.

FIRST CLAIM FOR RELIEF:

28 U.S.C. §2201, et seq.

137.    Plaintiff restates and incorporates herein by this reference the allegations

contained in paragraphs 1 through 136 hereof.

138.    This claim for relief arises out of an actual controversy between the

parties within the jurisdiction of the Court.

139.    PAIMI laws at 42 U.S.C. §10805(a)(4) provide that Plaintiff shall:

> (4) in accordance with section 10806 of this title, have access to all records of--
>
> (A) any individual who is a client of the system if such individual, or the legal guardian, conservator, or other legal  representative of such individual, has authorized the system to have such access;
> (B) any individual (including an individual who has died or whose whereabouts are unknown)--

34

(i) who by reason of the mental or physical condition of such individual    is unable to authorize the system to have such access;

(ii) who does not have a legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State; and

(iii) with respect to whom a complaint has been received by the system or with respect to whom as a result of monitoring or other activities (either of which result from a complaint or other evidence) there is probable cause to believe that such individual has been subject to abuse or neglect; and

(C) any individual with a mental illness, who has a legal guardian, conservator, or other legal representative, with respect to whom a complaint has been received by the system or with respect to whom there is probable cause to believe the health or safety of the individual is in serious and immediate jeopardy, whenever--

(i) such representative has been contacted by such system upon receipt of the name and address of such representative;

(ii) such system has offered assistance to such representative to resolve the situation; and

(iii) such representative has failed or refused to act on behalf of the individual;

140.    PAIMI regulations at 42 C.F.R. §51.43 state that:

If a P&A system's access to facilities, programs, residents, or records covered by the Act of this part is delayed or denied, the P&A system shall be provided promptly with a written statement of reasons, including, in the case of a denial for alleged lack of authorization, the name, address and telephone number of the legal guardian, conservator, or other legal representative of an individual with mental illness.  Access to facilities, records or residents shall not be delayed or denied without the prompt provision of written statements of the reasons for the denial.

141.    PAIMI regulations at 42 C.F.R §51.41(e) state that a P&A system shall be permitted to inspect and copy records, subject to a "reasonable" charge to offset duplicating costs.

142.    PAIMI regulations at 42 C.F.R 51.42(b) provide:

A P&A system shall have reasonable unaccompanied access to public and private facilities and programs in the State which render care or treatment for individuals with mental illness, and to all areas of the facility which are used by residents or are accessible to residents. The P&A system shall have reasonable unaccompanied access to residents at all times necessary to conduct a full investigation of an incident of abuse or neglect. This authority shall include the opportunity to interview any facility service recipient, employee, or other persons, including the person thought to be the victim of such abuse, who might be reasonably believed by the system to have knowledge of the incident under investigation. Such access shall be afforded, upon request, by the P&A system when:

(1) An incident is reported or a complaint is made to the P&A system;

(2) The P&A system determines there is probable cause to believe that an incident has or may have occurred; or

(3) The P&A system determines that there is or may be imminent danger of serious abuse or neglect of an individual with mental illness.

143.    DD Act laws at 42 U.S.C. §15043(2(A)(i) states that a P&A system shall:

(A) have the authority to–

(i) pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of such individuals within the State who are or who may be eligible for treatment, services, or habilitation, or who are being considered for a change in living arrangements, . . .

144.    DD Act laws at 42 U.S.C. §15043(2)(B) states that a P&A system shall:

   (B)have the authority to investigate incidents of abuse and neglect of individuals with developmental disabilities if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred;


145.    DD Act laws at 42 U.S.C. §15043(2)(I) state that a P&A system shall:

   (I) have access to all records of--

   (i) any individual with a developmental disability who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access;

   (ii) any individual with a developmental disability, in a situation in which--

   (I) the individual, by reason of such individual's mental or physical condition, is unable to authorize the system to have such access;

   (II) the individual does not have a legal guardian, conservator, or other legal representative, or the legal guardian of the individual is the State; and

   (III) a complaint has been received by the system about the individual with regard to the status or treatment of the individual or, as a result of monitoring or other activities, there is probable cause to believe that such individual has been subject to abuse or neglect; and

   (iii) any individual with a developmental disability, in a situation in which--

   (I) the individual has a legal guardian, conservator, or other legal representative;

   (II) a complaint has been received by the system about the individual with regard to the status or treatment of the individual or, as a result of monitoring or other activities, there is probable cause to believe that such individual has been subject to abuse or neglect;

(III) such representative has been contacted by such system, upon receipt of the name and address of such representative;

(IV) such system has offered assistance to such representative to resolve the situation; and

(V) such representative has failed or refused to act on behalf of the individual;

146.   DD Act laws at 42 U.S.C. §15043(2)(J) states that a P&A system shall:

(J)(i) have access to the records of individuals described in subparagraphs (B) and (I), and other records that are relevant to conducting an investigation, under the circumstances described in those subparagraphs, not later than 3 business days after the system makes a written request for the records involved; and

(ii) have immediate access, not later than 24 hours after the system makes such a request, to the records without consent from another party, in a situation in which services, supports, and other assistance are provided to an individual with a developmental disability--

(I) if the system determines there is probable cause to believe that the health or safety of the individual is in serious and immediate jeopardy; or

(II) in any case of death of an individual with a developmental disability;

147.   The DD Act regulation at 45 C.F.R. §1386.22(a) states that:

(a)A protection and advocacy (P&A) system shall have access to the records of any of the following individuals with developmental disabilities:

(1) An individual who is a client of the system, including any person who has requested assistance from the system, if authorized by that individual or their legal guardian, conservator or other legal representative.

(2) An individual, including an individual who has died or whose whereabouts is unknown, to whom all of the following conditions apply:

(i) The individual, due to his or her mental or physical condition is unable to authorize the system to have access;

(ii) The individual does not have a legal guardian, conservator or other legal representative, or the individual's guardian is the State (or one of its political subdivisions); and

(iii) With respect to whom a complaint has been received by the system or the system has probable cause (which can be the result of monitoring or other activities including media reports and newspaper articles) to believe that such individual has been subject to abuse or neglect.

(3) An individual who has a legal guardian, conservator, or other legal representative, with respect to whom a complaint has been received by the system or with respect to whom the system has determined that there is probable cause to believe that the health or safety of the individual is in serious and immediate jeopardy, whenever all the following conditions exist:

(i) The system has made a good faith effort to contact the representative upon receipt of the representative's name and address;

(ii) The system has offered assistance to the representative to resolve the situation; and

(iii) The representative has failed or refused to act on behalf of the individual.

148.   Defendants' acts of refusing to produce or unreasonably delaying access to records and documents necessary to Plaintiff's federally-based investigation authority constitute unlawful access restrictions and are acts of retaliation against Plaintiff.

149.   The Defendants' acts in ordering, authorizing, and condoning the removal, or alteration of documents or files, delaying the provision of and concealing relevant information, and acts of employee intimidation and coercion to limit information that P&A

might obtain in its investigations into the abuse or neglect of individuals with disabilities constitute unlawful access restrictions and are acts of retaliation against Plaintiff.

150.    Defendants by their actions as alleged in prior paragraphs hereof have violated the Settlement Agreement reached in the *Chris S.* Action.

151.    Plaintiff, as a party to the Settlement Agreement, seeks a declaration from the Court that Defendants have breached the Settlement Agreement by conducting acts of retaliation against Plaintiff, an injunctive order for enforcement of the Settlement Agreement, and for such other and further relief as is identified below.

SECOND CLAIM FOR RELIEF:
42 U.S.C. §1983

152.    Plaintiff restates and incorporates herein by this reference the allegations contained in paragraphs 1 through 151 hereof.

153.    The actions of the Defendants as alleged in prior paragraphs hereof were done under color of state law and have deprived Plaintiff of a full, complete, and meaningful access to individuals who might be reasonably believed by Plaintiff to have knowledge of the incident under investigation, patients, and patient and other records, at state facilities

and institutions as mandated by the DD Act and PAIMI.

154.    The actions of the Defendants as alleged in prior paragraphs hereof were done under color of state law and are acts of retaliation against Plaintiff for exercising its

statutory right to access patient and other records at state facilities and institutions and for preparing and filing a legal action against the Defendants, all in violation of 42 U.S.C. 1983.

155. Defendants by their actions as alleged in prior paragraphs hereof have violated 42 U.S.C §10805 and the implementing regulations at Title 42, Part 51, Code of Federal Regulations (PAIMI).

156. Defendants by their actions as alleged in prior paragraphs hereof have violated 42 U.S.C §15043 and the implementing regulations at Title 45, Part 1386, Code of Federal Regulations (DD Act).

157. The acts and conduct of Defendants are capable of occurring and likely to occur again. Plaintiff has no fair, adequate or speedy remedy at law and will suffer irreparable harm without injunctive relief by this Court.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff prays that the Court:

1. Issue a declaratory judgment that Defendants have breached the *Chris S.* Settlement Agreement and 42 U.S.C. §1983 by their acts of retaliation against Plaintiff.

2. Issue a declaratory judgment that Defendants have delayed, impeded and denied Plaintiff full, complete, and meaningful access to individuals who might be reasonably believed by Plaintiff to have knowledge of the incident under investigation, patients, patient and other records at state facilities and institutions as mandated by the Protection and Advocacy for Mentally Ill Individuals Act of 1986, 42 U.S.C. §§10801, *et seq.*

41

and Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. §§15001, *et seq.*

3.      Grant Plaintiff permanent injunctive relief requiring Defendants to fully comply with and abide by the access-right provisions of PAIMI and the DD Act and more specifically, to provide Plaintiff access to all records of individuals included within the coverage of either the DD Act or PAIMI, not later than 3 business days after the system makes a written request for the records involved; or in cases where Plaintiff determines there is probable cause to believe that the health or safety of the individual is in serious and immediate jeopardy; or in any case of death of an such as individual, immediately, and in no event later than 24 hours, without consent from another party, after Plaintiff makes such a request; and, specifically, that the Health Insurance Portability and Accountability Act and its regulations shall not be a basis for denial of or delay in providing plaintiff with access as provided in PAIMI and the DD Act; and to provide Plaintiff with access to facility incident reports as necessary for Plaintiff to reasonably fulfill its statutorily-created duty to monitor facilities providing services to individuals with disabilities.

4.      Awarded Plaintiff its attorneys' fees and costs as allowed by and pursuant to 42 U.S.C. §1988, or as may otherwise be allowed by law.

5.      That the Court retain continuing jurisdiction over this matter by appointment of a special master who could, among other things, issue contempt orders and seek Court

42

approval and enforcement of any of his decisions without the necessity of commencing a new or separate legal action.

6.     For other and further relief as the Court may deem just and equitable.

Dated this _30th_ day of August, 2005.

> Protection & Advocacy System, Inc., Plaintiff.

> By: _Kathleen M Karpan_
> Kathleen M. Karpan
> Bagley, Karpan, Rose & White, LLC
> 1107 West 6th Avenue
> Cheyenne, WY 82001
> (307) 634-0446
> Fax:  (307) 637-7445

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was forwarded as noted below, this _30th_ day of August, 2005:

| Patrick J. Crank<br>Misha Westby<br>Terry L. Armitage<br>Wyoming Attorney General's Office<br>123 Capital Bldg.<br>Cheyenne, WY  82002 | | Facsimile |
| | | U.S. Mail |
| | | Overnight Courier |
| | | Hand Delivery |

_Kathleen M Karpan_